### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LAWRENCE J. GOELZ, derivatively on behalf of nominal defendant HURON CONSULTING GROUP, INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| GARY E. HOLDREN, GARY L. BURGE, WAYNE LIPSKI, DAVID M. SHADE, GEORGE E. MASSARO, DUBOSE AUSLEY, JAMES D. EDWARDS, H. EUGENE LOCKHART, JOHN S. MOODY and JOHN F. MCCARTNEY, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and | |
| HURON CONSULTING GROUP, INC., | |
| Nominal Defendant. | |

Plaintiff Lawrence J. Goelz ("Plaintiff"), by the undersigned attorneys, derivatively on behalf of Huron Consulting Group, Inc. ("Huron" or the "Company") alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding Huron, as follows:

### NATURE OF THE ACTION

1.    Plaintiff brings this action derivatively for the benefit of Huron against the members of its Board of Directors (the "Board") and certain of its current and former executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of law.

1

2.     The Individual Defendants (defined herein) breached their fiduciary duties by, among other things, knowingly establishing procedures and practices to improperly account for certain acquisition-related payments to employees of four businesses that Huron acquired between 2005 and 2007, in violation of Generally Accepted Accounting Principles ("GAAP"), in order to artificially inflate the Company's financial results. These improper accounting practices were rampant throughout the Company. The Board knew of these pervasive improprieties but did nothing to prevent or stop them.

3.     The Individual Defendants engaged in these unlawful practices in order to create the impression that the Company had higher net income and earnings per share than it actually did.     These improper accounting practices affected every financial statement the Company filed with the SEC between 2006 and 2009. The Individual Defendants concealed from Huron's shareholders their improper accounting practices and the material impact those practices had on the Company's financials, and falsely portrayed the Company's actual financial performance.

4.     On July 31, 2009, the improper practices were brought to light when the Company announced that it would restate its financial results for fiscal years 2006 through 2008 and the first three months of 2009 due to the Company's failure to properly account for earn-out payments made in connection with four acquisitions. Earn-outs are financial rewards based on the performance of the acquired unit after the acquisition is completed. Huron stated that Company employees had shared earn-outs with junior employees at the units who weren't involved in the original sale. Additionally, some of the proceeds were distributed based on performance of employees who stayed at Huron, not based on the ownership interests of those employees in the businesses that were acquired. These payouts should have been booked as a noncash operating expense, but were instead booked in such a way that the Company's net income and earnings per share were inflated. As a result, Huron stated that it expected to reduce its reported revenue for the affected periods by 48 percent, from $120 million on an aggregate basis to $64

2

million. Further, Huron withdrew its 2009 earnings guidance, lowered its 2009 revenue guidance and reported second-quarter revenue below analysts' expectations. Additionally, Huron announced that defendants Holdren, Burge and Lipski would resign.

5. As a result of the Individual Defendants' breaches of fiduciary duties, the Company has been the subject of investigations and has suffered severe loss of reputation and standing in the industry.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7. Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

8. Plaintiff, a citizen of the State of North Carolina, is a shareholder of Huron, was a shareholder of Huron at the time of the wrongdoing alleged herein, and has been a shareholder of Huron continuously since that time.

9. Nominal Defendant Huron is a Delaware corporation with its principal executive offices located at 550 West Van Buren Street, Chicago, Illinois 60607. According to its public filings, Huron helps clients in diverse industries improve performance, comply with complex regulations, resolve disputes, recover from distress,

3

leverage technology, and stimulate growth. Huron provides services to both financially sound and distressed organizations, including academic institutions, healthcare organizations, Fortune 500 companies, medium-sized businesses, and the law firms that represent these various organizations.

10.    Defendant Gary E. Holdren ("Holdren") served as the Company's President and Chief Executive Officer ("CEO") until July 27, 2009, and as Chairman of the Board from May 2009 until July 27, 2009. Holdren is a Certified Public Accountant ("CPA") and was formerly a partner and the Midwest Director of global client services at Arthur Andersen LLP ("Arthur Andersen"). Additionally, Holdren previously served on Arthur Andersen's U.S. management committee and the executive council of Andersen Worldwide. Holdren is a citizen of Illinois.

11.    Defendant Gary L. Burge ("Burge") served as the Company's Chief Financial Officer ("CFO") and Vice President until July 31, 2009, and will serve as Treasurer until December 31, 2009. Burge previously served as CFO of PrimeCo Wireless Communications, and prior to that was CFO for investment information and services provider Morningstar, Inc. Additionally, Burge has held positions in finance, information technology, engineering and mergers and acquisitions at telecommunications company Centel Corporation. Burge is a citizen of Illinois.

12.    Defendant Wayne Lipski ("Lipski") served as the Company's Chief Accounting Officer ("CAO") until July 31, 2009. Lipski is a CPA, member of the American Institute of Certified Public Accountants, and was an auditor for Arthur Andersen. Lipski is a citizen of Illinois.

13.    Defendant David M. Shade ("Shade") has served as the Company's President and Chief Operating Officer since May 6, 2009, and served as Vice President, Healthcare since May 2007. Shade is a CPA, holds a bachelor's degree in accounting, along with an MBA. Shade is a citizen of Illinois.

4

14. Defendants Holdren, Burge, Lipski and Shade will be referred to herein as "Officer Defendants."

15. Defendant George E. Massaro ("Massaro") has served as a director of the Company since May 2004, Vice Chairman since March 2005 and is currently Non-Executive Chairman. Massaro is a CPA and former managing partner of Arthur Andersen's New England practice and Boston office. Massaro is a citizen of Illinois.

16. Defendant DuBose Ausley ("Ausley") has served as a director of the Company since October 2004. Ausley is a member of the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee. Ausley is a citizen of Florida.

17. Defendant James D. Edwards ("Edwards") has served as a director of the Company since October 2004. Edwards is Chairperson of the Nominating and Corporate Governance Committee and is a member of the Audit Committee. Edwards is a CPA and member of the American Institute of Certified Public Accountants. Additionally, Edwards is a former managing partner of global markets at Arthur Andersen, where he had begun working in 1964. Edwards is a citizen of Illinois.

18. Defendant H. Eugene Lockhart ("Lockhart") has served as a director of the Company since December 2006. Lockhart is a member of the Compensation Committee and Nominating and Corporate Governance Committee. Lockhart has an MBA, and has served as partner and chairman, Financial Institutions, of a private equity investment firm. Lockhart is a citizen of Virginia.

19. Defendant John S. Moody ("Moody") has served as a director of the Company since November 2005. Moody serves as Chairperson of the Compensation Committee and is a member of the Nominating and Corporate Governance Committee. Moody is a citizen of Texas.

20. Defendant John F. McCartney ("McCartney") has served as a director of the Company since October 2004. McCartney is Chairperson of the Audit Committee,

and is a member of the Compensation Committee. McCartney has an MBA, and served as CFO of US Robotics. McCartney is a citizen of Illinois.

21.     Defendants Massaro, Ausley, Edwards, Lockhart, Moody and McCartney will be referred to herein as the "Director Defendants."

22.     Defendants Holdren, Burge, Lipski, Shade, Massaro, Ausley, Edwards, Lockhart, Moody and McCartney will be referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers, directors, and/or fiduciaries of Huron and because of their ability to control the business and corporate affairs of Huron, the Individual Defendants owed Huron and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Huron in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Huron and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Huron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Huron, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Huron, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

6

25.     To discharge their duties, the officers and directors of Huron were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Huron were required to, among other things:

       a.     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

       b.     exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

       c.     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

26.     All employees of Huron, including the Individual Defendants, were required to comply with the Company's Code of Business Conduct and Ethics (Amended and Readopted – December 4, 2008). This code of ethics stressed the "critical importance" of the Company's SEC filings being full and accurate. Additionally, the code specifically stated that it was Huron's policy to comply with all applicable financial reporting and accounting regulations, and that it was necessary to maintain the Company's financial statements in sufficient detail to conform to the Company's system of internal controls. The Company's Code of Business Conduct and Ethics stated, in relevant part:

## RESPONSIBILITY TO OUR ORGANIZATION
### Compliance With Laws, Rules And Regulations

You are required to comply with the laws, rules and regulations that govern the conduct of our business, both in the U.S. and in other countries, including the states and other jurisdictions that regulate the Company's activities. If you have questions about the applicability or meaning of a law, rule or regulation, please consult your practice group leader or the Compliance Officer.

*　　*　　*

### Company Books and Records

As a public company, it is of critical importance that the Company's filings with the Securities and Exchange Commission and other public statements, such as press releases, be full, fair and accurate, timely and understandable. Depending on your position with the Company, you may be called upon to provide information that ensures that the disclosures in the Company's public reports and other public statements are full, fair and accurate. If we request information from you, we expect you to take this responsibility very seriously and to provide prompt, accurate and complete answers to inquiries related to the Company's public disclosure requirements.

As applicable, you must maintain the Company's books, records, accounts and financial statements in reasonable detail to appropriately reflect the Company's transactions and must conform both to applicable requirements and to the Company's system of internal controls.

The Company's policy is to comply with all applicable financial reporting and accounting regulations applicable to the Company. If you have any concerns or complaints regarding questionable accounting or auditing matters of the Company, you are encouraged to report them as described in the Company's Policy on Reporting Concerns and Complaints Regarding Accounting, Internal Accounting Controls and Auditing Matters . . .

*　　*　　*

While each of us is individually responsible for putting the Code to work, we need not go it alone. The Company has designated the General Counsel as the Chief Compliance Officer, who will assist all of us in complying with the Code. The Company also has a number of resources, people and processes in place to answer our questions and guide us through difficult decisions. Copies of this Code are available from the Compliance Officer and on the Company's Intranet at http://intranet.huronconsultinggroup.com/Library/Files/Cor porate_Groups/Codeof0BusinessConductandEthics.pdf.

Ultimate responsibility to ensure that we as a Company comply with the many laws, rules, regulations and ethical

8

standards affecting our business rests with each of us. You must become familiar with and conduct yourself strictly in compliance with those laws, rules, regulations and standards and the Company's policies and guidelines pertaining to them.

27. The Directors were required to comply with the Corporate Governance Guidelines of Huron Consulting Group, Inc. (Amended as of December 4, 2008). The guidelines specifically stated that all directors and officers were expected to act ethically and adhere to the Code of Business Conduct and Ethics, and that the goal of the Board is to build shareholder value and assure the vitality of the Company for clients and employees. The Corporate Governance Guidelines stated, in relevant part:

**THE BOARD**
**Role of Directors**
The business and affairs of the Company shall be under the direction of the Board. A director is expected to spend the time and effort necessary to properly discharge such director's responsibilities. Accordingly, a director is expected to regularly attend meetings of the Board and committees on which such director sits, and to review prior to meetings material distributed in advance for such meetings. A director who is unable to attend a meeting (which it is understood will occur on occasion) or who wishes to participate telephonically is expected to notify the Corporate Secretary or the Chairman of the Board or the Chairman of the appropriate committee in advance of such meeting.

**The Board's Goals**
The Board's goals are generally to build long-term value for the Company's stockholders and to assure the vitality of the Company for its clients, employees and the other individuals and organizations that depend on the Company. To achieve these goals the Board will monitor both the performance of the Company (in relation to its financial objectives, significant goals, strategies and competitors) and the performance of the Chief Executive Officer, and offer constructive advice and feedback. When it is appropriate or necessary, it is the Board's responsibility to remove the Chief Executive Officer and to select a successor.

\* \* \*

**Independence of the Board**
The Board shall be comprised of a majority of directors who, in the business judgment of the Board, qualify as independent directors ("Independent Directors") under the

listing standards of the Nasdaq Stock Market, Inc. ("Nasdaq").

Each director's relationships with the Company (either directly or as a partner, stockholder or officer of an organization that has a relationship with the Company) shall be reviewed annually, and only those directors (i) who the Board affirmatively determines have no material relationship with the Company (either directly or as a partner, stockholder or officer of an organization that has a relationship with the Company), (ii) who in the opinion of the Board have no relationship which would interfere with the exercise of independent judgment in carrying out the responsibilities of a director, and (iii) who otherwise meet the requirements of the applicable listing standards will be considered Independent Directors. The Board may adopt and disclose categorical standards to assist it in determining director independence.

\* \* \*

**BUSINESS CONDUCT AND ETHICS**
The Board expects all directors, as well as officers and employees, to act ethically at all times and to adhere to the Company's "Code of Business Conduct and Ethics."

28. The Individual Defendants, particularly Burge, the former CFO, Lipski, the former CAO, and Audit Committee members McCartney, Edwards and Ausley, were responsible for maintaining and establishing adequate internal accounting controls for the Company and ensuring that the Company's financial statements were based on accurate financial information.

29. According to the Charter of the Audit Committee of the Board of Directors of Huron Consulting Group, Inc. (amended as of January 30, 2007), the Audit Committee's purpose was to oversee Huron's accounting and financial reporting process. In addition, the committee was to review the effectiveness and adequacy of Huron's internal controls and accounting policies. The Charter of the Audit Committee stated, in relevant part:

**I. PURPOSE OF THE COMMITTEE**
The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Huron Consulting Group Inc. (the "Corporation") is to oversee the accounting and financial reporting processes of the Corporation and its subsidiaries and the audits of the financial statements of the Corporation.

10

\*     \*     \*

## IV. DUTIES AND RESPONSIBILITIES OF THE COMMITTEE

In carrying out its duties and responsibilities, the Committee's policies and procedures should remain flexible, so that it may be in a position to best address, react or respond to changing circumstances or conditions. The following duties and responsibilities are within the authority of the Committee and the Committee shall, consistent with and subject to applicable law and rules and regulations promulgated by the SEC, Nasdaq, or any other applicable regulatory authority:

*Selection, Evaluation, and Oversight of the Auditors*
(a) Be directly responsible for the appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation, and each such registered public accounting firm must report directly to the Committee (the registered public accounting firm engaged for the purpose of preparing or issuing an audit report for inclusion in the Corporation's Annual Report on Form 10-K is referred to herein as the "independent auditors");

(b) Review and, in its sole discretion, approve in advance the Corporation's independent auditors' annual engagement letter, including the proposed fees contained therein, as well as all audit and, as provided in Section 10A of the Exchange Act and the SEC rules and regulations promulgated thereunder, all permitted non-audit engagements and relationships between the Corporation and such independent auditors (which approval should be made after receiving input from the Corporation's management, if desired). Approval of audit and permitted non-audit services will be made by the Committee. The Committee may establish pre-approval policies and procedures, as permitted by Section 10A of the Exchange Act and the SEC rules and regulations promulgated thereunder, for the engagement of independent accountants to render services to the Corporation, including but not limited to policies that would allow the delegation of pre-approval authority to one or more members of the Committee, provided that any pre-approvals delegated to one or more members of the Committee are reported to the Committee at its next scheduled meeting;

(c) Review the performance of the Corporation's independent auditors, including the lead partner of the independent auditors, and, in its sole discretion, make decisions regarding the replacement or termination of the

independent auditors when circumstances warrant;

(d) Evaluate the independence of the Corporation's independent auditors by, other things:

     (i) obtaining and reviewing from the Corporation's independent auditors a formal written statement delineating all relationships between the independent auditors and the Corporation, consistent with Independence Standards Board Standard 1;

     (ii) actively engaging in a dialogue with the Corporation's independent auditors with respect to any disclosed relationships or services that may impact the objectivity and independence of the auditors; and

     (iii) taking, or recommending that the Board take, appropriate action to oversee the independence of the Corporation's independent auditors;

     (iv) monitoring compliance by the Corporation's independent auditors with the audit partner rotation requirements contained in Section 10A of the Exchange Act and the rules and regulations promulgated by the SEC thereunder;

*Oversight of Annual Audit and Quarterly Reviews*
(e) Review and discuss with the independent auditors their annual audit plan, including the timing and scope of audit activities, and monitor such plan's progress and results during the year;

(f) Review with the Corporation's independent auditors the following information, which is required to be reported by the independent auditor:

     (i) all critical accounting policies and practices to be used;

     (ii) all alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors;

(iii) all other material written communications between the independent auditors and management, such as any management letter and any schedule of unadjusted differences;

(g) Review with management and the Corporation's independent auditors and, if appropriate, the internal auditor, the Corporation's annual audited financial statements and quarterly financial statements, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any major issues related thereto;

(h) Resolve all disagreements between the Corporation's independent auditors and management regarding financial reporting;

*Oversight of Financial Reporting Process and Internal Controls*
(i) Review the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures on a regular basis;

(j) Review with management, as the Committee determines to be necessary, the progress and results of material internal audit projects, and, when deemed necessary or
appropriate by the Committee, direct the Corporation's chief executive officer to assign additional internal audit projects to the internal auditor;

(k) Review with the Corporation's independent auditors any matter related to the conduct of the audit which is to be communicated to the Committee under Generally
accepted auditing standards, particularly Statement of Auditing Standards No. 61, as it may be modified or supplemented, or the rules and regulations of the SEC;

(l) Receive periodic reports from the Corporation's independent auditors, management and the internal auditor to assess the impact on the Corporation of significant accounting or financial reporting developments that may have a bearing on the Corporation;

(m) Establish and maintain free and open means of communication between and among the Committee, the Corporation's independent auditors, the Corporation's internal auditing department and management;

(n) Review the type and presentation of information to be included in the Corporation's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Corporation to analysts and rating agencies (which review may be done generally (i.e., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance

each earnings release or each instance in which the
Corporation may provide earnings guidance);

*Miscellaneous*
(o) Review and approve, ratify or disapprove of proposed
transactions or courses
of dealings with respect to which executive officers or
directors or members of their immediate families have an
interest (including all transactions required to be disclosed
by Item 404(a) of Regulation S-K);

(p) Prepare the report required by the rules of the SEC to be
included in the Corporation's annual proxy statement;

(q) Establish procedures for (i) the receipt, retention and
treatment of complaints received by the Corporation
regarding accounting, internal accounting controls or
auditing matters, and (ii) the confidential, anonymous
submission by employees of the Corporation of concerns
regarding questionable accounting or auditing matters;

(r) Secure independent expert advice to the extent the
Committee determines it to be appropriate, including
retaining, with or without Board approval, independent
counsel, accountants, consultants or others, to assist the
Committee in fulfilling its duties and responsibilities, the
cost of such independent expert advisors to be borne by the
Corporation;

(s) Review and assess the adequacy of this Charter on an
annual basis; and

(t) Perform such additional activities, and consider such
other matters, within the scope of its responsibilities, as the
Committee or the Board deems necessary or appropriate.

## V. INVESTIGATIONS AND STUDIES; OUTSIDE ADVISERS
The Committee may conduct or authorize investigations
into or studies of matters
within the Committee's scope of responsibilities, and may
retain, at the Corporation's
expense, such independent counsel or other consultants or
advisers as it deems necessary.

\*       \*       \*

While the Committee has the duties and responsibilities set
forth in this charter, the Committee is not responsible for
preparing or certifying the financial statements, for
planning or conducting the audit, or for determining
whether the Corporation's financial statements are
complete and accurate and are in accordance with generally
accepted accounting principles and applicable rules and

14

regulations. These tasks are the responsibility of management and the Corporation's independent auditors.

30. As alleged herein, the Individual Defendants knowingly failed to implement and maintain adequate internal control systems for the Company, and thereby violated: (i) their fiduciary duties of good faith and loyalty; (ii) GAAP; and (iii) as to the Audit Committee members, the Audit Committee Charter.

## SUBSTANTIVE ALLEGATIONS

### Background

31. Huron is a consulting company that provides financial and legal consulting services to various institutions. The Company was started in 2002 by former Arthur Andersen employees, including 25 partners, with the goal of specializing in consulting for bankruptcy and litigation, as well as health care and education. The Arthur Andersen presence is still pronounced at the Company, as Director Defendants Massaro and Edwards are former Arthur Andersen partners. Similarly, Defendant Holdren is a former Arthur Andersen partner.

32. The vast majority of the Individual Defendants are purported financial and accounting experts who hold advanced degrees in such disciplines. For example, defendants Holdren, Lipski, Shade, Massaro and Edwards are CPAs, and defendants Shade, Lockhart and McCartney hold MBAs. Nearly all of the Individual Defendants have served as accountants, auditors and/or financial officers during their careers.

### False and Misleading Statements

33. The Individual Defendants knowingly caused or allowed the Company to make false and misleading statements regarding its financial performance in press releases and SEC filings.

34. As known by the Individual Defendants, their improper accounting practices caused Huron's earnings releases and financial statements to misstate the Company's net income and earnings per share because the Individual Defendants failed

15

to properly account for certain acquisition-related payments to employees of four businesses that Huron acquired between 2005 and 2007.

35.     The Individual Defendants continued to announce and affirm the Company's financial results, which they knew were materially false due to the improper accounting for certain acquisition-related payments. Quarter after quarter, year after year, the Individual Defendants knowingly caused or allowed the Company to make false and misleading statements regarding its financial results.

36.     On or about February 22, 2007, Huron filed with the SEC its Form 10-K for fiscal year 2006. The Company's February 22, 2007 Form 10-K was signed by defendants Holdren, Massaro, Burge, Ausley, Edwards, Lockhart, McCartney and Moody, and reported for the full year ended December 31, 2006, among other things, revenues of $288.6 million and net income of $26.7 million, or $1.54 per diluted share.

37.     On or about February 21, 2008, Huron filed with the SEC its Form 10-K for fiscal year 2007. The Company's February 21, 2008 Form 10-K was signed by defendants Holdren, Massaro, Burge, Ausley, Edwards, Lockhart, McCartney and Moody, and reported for the full year ended December 31, 2007, among other things, revenues of $504.3 million and net income of $41.9 million, or $2.32 per diluted share.

38.     On or about February 24, 2009, Huron filed with the SEC its Form 10-K for fiscal year 2008. The Company's February 24, 2009 Form 10-K was signed by defendants Holdren, Massaro, Burge, Ausley, Edwards, Lockhart, McCartney and Moody, and reported for the full year ended December 31, 2008, among other things, revenues of $615.5 million and net income of $40.7 million, or $2.13 per diluted share.

39.     On or about April 30, 2009, Huron filed with the SEC its Form 10-Q for the first quarter of 2009. The Company's April 30, 2009 Form 10-Q was signed by Defendant Burge, and reported for the first quarter ended March 31, 2009, among other things, revenues of $163 million and net income of $10.3 million, or $0.51 per diluted share.

40.     The Company's Forms 10-K for fiscal years 2006, 2007 and 2008 and Form 10-Q for the first quarter of 2009 falsely stated that the Company's financial statements were prepared in conformity with GAAP.

41.     Moreover, during the relevant period, defendants Holdren and Burge signed Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("Certifications"), which attested to the purported accuracy of the financial statements contained in 2006, 2007 and 2008 Annual Reports and First Quarter 2009 Quarterly Report, the effectiveness of internal controls, and compliance with Section 13(a) of the Exchange Act, when they knew that these Certifications were false and misleading.  Defendants Holdren and Burge knew that financial results overstated net income and earnings per share.

## Disclosure of the Individual Defendants' Wrongdoing

42.     On or about July 31, 2009, the Company issued a press release entitled "Huron Consulting Group Announces Intention to Restate Financial Statements and Management Changes; The Company Provides Preliminary Second Quarter and Estimated Full Year 2009 Revenues." Therein, the Company announced that it estimated restated financial results to be as follows: restated full year 2006 net income of approximately $23 million, or $1.32 per diluted share; restated full year 2007 net income of approximately $24 million, or $1.35 per diluted share; restated full year 2008 net income of approximately $10 million, or $0.53 per diluted share; and restated first quarter 2009 net income of approximately $6 million, or $0.32 per diluted share.  It was in this press release that for the first time, the Company announced that it would be forced to restate is financial statements from 2006 through 2009.  Similarly, the Company also publicly announced the resignations of defendants Holdren and Lipski.  Huron's press release stated, in relevant part:

17

Huron Consulting Group Inc. (NASDAQ: HURN), a leading provider of business consulting services, today announced that the Company will restate its financial statements for the fiscal years 2006, 2007 and 2008 and the first quarter of 2009, to correct the Company's accounting for certain acquisition-related payments received by the sellers in connection with the sale of certain acquired businesses that were subsequently redistributed among themselves and to other select Huron employees. As a result, the historical financial statements for these periods should no longer be relied upon. The restatement items are non-cash charges with a total estimated impact on net income and EBITDA for all restated periods of $57 million. The restatement has no impact on cash, cash flows from operations, or adjusted EBITDA. The sellers have recently amended their agreements related to these payments. While there can be no assurances, as discussed below, the Company currently anticipates that the non-cash compensation charges causing the restatement will not continue past July 31, 2009. In addition, the Company announced management changes, including the appointment of George Massaro as Non-Executive Chairman of the Board and James H. Roth, a founder of the Company, as Chief Executive Officer. Both appointments follow the resignation of Gary E. Holdren as Chairman of the Board and Chief Executive Officer.

**Financial Statement Restatement**

The restatement relates to four businesses that the Company acquired between 2005 and 2007 (the "Acquired Businesses"). Pursuant to the purchase agreements for each of these acquisitions, payments were made by the Company to the selling shareholders upon closing of the transaction and also, in some cases, upon the Acquired Businesses achieving specific financial performance targets over a number of years ("earn-outs"). These payments are collectively referred to as "acquisition-related payments."

It recently came to the attention of the Audit Committee of the Board of Directors that, in connection with one of these acquisitions, the selling shareholders had an agreement among themselves to reallocate a portion of the earn-out payments to an employee of the Company who was not a selling shareholder. Following this discovery, the Audit Committee commenced an inquiry into the relevant facts and circumstances of all of the Company's prior acquisitions to determine if similar situations existed. The Audit Committee engaged legal and financial advisors to assist it with the inquiry and notified the Company's independent auditors who had not previously been aware of the Shareholder and Employee Payments described below.

This inquiry resulted in the discovery that the selling shareholders of the Acquired Businesses:

1) Redistributed portions of their acquisition-related

payments among themselves in amounts that were not consistent with their ownership percentages ("Shareholder Payments") at the date of acquisition by Huron. Such payments were dependent, in part, on continuing employment with Huron or on the achievement of personal performance measures; or

2) Redistributed portions of their acquisition-related payments to certain Company employees ("Employee Payments") who were not selling shareholders of the Acquired Businesses. Such payments were dependent on continuing employment with Huron or on the achievement of personal performance measures.

Under generally accepted accounting principles, including guidance promulgated by the U.S. Securities and Exchange Commission ("SEC"), actions of economic interest holders in a company may be imputed to the company itself. As the selling shareholders meet the criteria of economic interest holders in Huron, the Shareholder Payments and the Employee Payments are imputed to the Company even when the amounts that are reallocated do not differ significantly from ownership percentages at the date of the acquisition by Huron. As a result, both the Shareholder Payments and the Employee Payments are required to be reflected as non-cash compensation expense of the Company with a corresponding increase to additional paid-in capital. There is no tax impact to these adjustments.

"Huron is committed to the highest standards of business conduct, compliance, financial reporting and internal controls," said John McCartney, chairman of the Audit Committee of Huron Consulting Group's Board of Directors. "When we became aware of these matters, the Audit Committee immediately engaged legal and accounting experts, who have been working diligently with our internal staff and independent auditors to identify, quantify and correct these matters."

While the correction of these errors significantly reduced the Company's net income, earnings per share and EBITDA for each of the affected periods, it had no effect on the Company's total assets, total liabilities, total stockholders' equity, cash flows from operations, or adjusted EBITDA.

\*       \*       \*

The expected impacts of the restatement described above are based on currently available information. The inquiry into acquisition-related matters by the Company and review of these matters by the Company's independent auditors are ongoing.

Based on the results of the inquiry into acquisition-related matters to date and the agreement amendments described

19

below, the Company currently anticipates that future earn-out payments will only be accounted for as additional purchase consideration and not also as non-cash compensation expense. Effective August 1, 2009, the selling shareholders of two of the Acquired Businesses each amended certain agreements related to the earn-out payments to provide that future earn-out payments will be distributed only to the applicable selling shareholders and only in accordance with their equity interests at the date of the acquisition by Huron and no further Shareholder Payments or Employee Payments will be made. As a result of these amendments, the Company expects to incur a moderate increase in cash compensation expense in future periods. However, the inquiry is ongoing, and there can be no assurance that additional information will not be discovered that will require these payments to continue to be accounted for as non-cash compensation expense, which would be material to results of operations through 2011. The earn-out payments for one of the Acquired Businesses are payable through March 31, 2010, and the earn-out payments for a second Acquired Business are payable through December 31, 2011. There are no additional earn-out obligations related to the other two Acquired Businesses.

In addition to the restatement and the inquiry into acquisition-related matters by the Company, the Company is conducting a separate inquiry, in response to an inquiry from the SEC, into the allocation of chargeable hours. This matter has no impact on billings to the Company's clients, but could impact the timing of when revenue is recognized. Based on information to date, the Company does not expect the allocation inquiry to result in a material adjustment to its historical financial statements.
Additional information could be discovered as a result of these inquiries described above or in the course of completing the restatement that could result in changes to the estimated amounts described above or additional adjustments.

As a result of the matters identified above, management is currently in the process of reviewing its internal control over financial reporting and expects that it will identify one or more material weaknesses in the Company's internal control over financial reporting. The Company will also assess its disclosure controls and procedures.
The foregoing uncertainties also could impact the Company's estimated revenues for the second quarter of 2009 and revenue guidance for the full year 2009, provided below.

The Company expects to file amended reports with respect to the periods in question, as well as its Quarterly Report on Form 10-Q for the quarter ended June 30, 2009, as soon as

practicable. As a result of the restatement, the Company is postponing its previously scheduled webcast on Thursday, August 6, 2009, to discuss its second quarter financial results and will announce new webcast details when they are available.

**Management Changes**
The Company announced the following management changes:

George Massaro, currently Vice Chairman of the Board, has been appointed Non-Executive Chairman of the Board, succeeding Gary E. Holdren. Massaro had previously served as Chief Operating Officer of Huron until May 2005, and subsequently as Vice Chairman of the Board.
James H. Roth, one of the founders of the Company and previously Vice President, Health and Education Consulting, has been named Chief Executive Officer, succeeding Holdren. Huron's Health and Education Consulting segment is the Company's largest business.
"I welcome the opportunity to serve as Chairman of Huron and to build on the strong momentum already in place," said Massaro. "Like the other executives at Huron, I am committed to ensuring the highest standards of conduct and governance."

"I am also excited to be working again with Jim Roth, who has an intimate knowledge of our business, a great reputation with our clients and the skills required to be an exceptional chief executive," Massaro continued. "In Jim Roth and David Shade, who was appointed President and Chief Operating Officer in May, the Company has two outstanding leaders."

"Through my years at Huron, I've had the pleasure of working closely with many of the Company's employees and have great respect for their dedication and commitment," said Roth. "I am confident in the strength of our business and I look forward to working with the entire talented team at Huron in serving our clients with their complex business needs and in taking advantage of opportunities for future success."

James K. Rojas, another founder of the Company, has been appointed Chief Financial Officer, succeeding Gary L. Burge who will remain Treasurer and continue with the Company until the end of the year. Rojas recently returned to the Company in a Corporate Development role. He joins Huron from Stop & Shop Supermarket Company where he served as Chief Financial Officer.

Wayne Lipski, previously Chief Accounting Officer, will be leaving the Company.
Holdren has resigned as Chairman and Chief Executive

Officer of the Company effective July 27, 2009 and will leave the Company at the end of August.

"I am greatly disappointed and saddened by the need to restate Huron's earnings. My management team and I have continually strived to establish legal, accounting and corporate governance conventions that are above reproach," said Holdren. "However, I am persuaded that, because of the manner in which selling shareholders' earn-out proceeds were distributed in certain recent transactions, Huron's accounting was incorrect. Because the issue arose on my watch, I believe that it is my responsibility and my obligation to step aside."

"On behalf of the Board of Directors I would like to recognize Gary for his extraordinary accomplishment in building Huron over the past seven years," said McCartney. "Gary has worked tirelessly on behalf of Huron and its shareholders and employees. We respect his leadership in choosing to pass the reins at this time."

No severance expenses are expected to be incurred by the Company as a result of the management changes described above.

**Preliminary Revenues and Selected Operating Metrics for the Second Quarter of 2009**
The Company expects revenues in the range of $164 million to $166 million for the second quarter of 2009, an increase of approximately 15% from $143.4 million for the second quarter of 2008, and revenues in the range of $327 million to $329 million for the first half of 2009, an increase of approximately 15% from $282.8 million for the first half of 2008.

The average number of full-time billable consultants increased 23.0% to 1,506 in the second quarter of 2009 compared to 1,224 in the same quarter last year. Full-time billable consultant utilization rate was approximately 69% during the second quarter of 2009 compared with 67% during the same period last year. The average number of full-time equivalent professionals totaled 854 in the second quarter of 2009 compared to 863 for the comparable period in 2008. Average billing rate per hour for full-time billable consultants was approximately $264 for the second quarter of 2009 compared to $273 for the second quarter of 2008.

43.     Then, on August 3, 2009, the Company issued a press release entitled "Huron Consulting Group Provides Restatement-Related Q&A." Here, the Company provided greater detail regarding the forthcoming restatement, including the reasons it

was necessary and the particulars of the earn-out payments. The press release stated, in

relevant part:

> Huron Consulting Group Inc. (NASDAQ: HURN), a
> leading provider of business consulting services, today
> posted the following Q&A on the Company's website as a
> follow up to its press release issued on July 31, 2009, in
> which the Company announced a restatement of its
> financial statements and management changes.
> This Q&A is intended to provide additional background
> information to the Company's investors, customers, and
> employees.
>
> *        *        *
>
> Huron Consulting Group Inc. (NASDAQ: HURN)
> announced on July 31, 2009 that the Company will restate
> its financial statements for the fiscal years 2006, 2007 and
> 2008 and the first quarter of 2009 to correct the Company's
> accounting for certain acquisition-related payments
> received by the sellers in connection with the sale of certain
> acquired businesses that were subsequently redistributed
> among themselves and to other select Huron employees.
>
> The restatement relates to four businesses that the
> Company acquired between 2005 and 2007 (the "Acquired
> Businesses"). Pursuant to the purchase agreements for each
> of these acquisitions, payments were made by the Company
> to the selling shareholders upon closing of the transaction
> and also, in some cases, upon the Acquired Businesses
> achieving specific financial performance targets over a
> number of years ("earn-outs"). These payments are
> collectively referred to as "acquisition-related payments."
> It recently came to the attention of the Audit Committee of
> the Board of Directors that, in connection with one of these
> acquisitions, the selling shareholders had an agreement
> among themselves to reallocate a portion of the earn-out
> payments to an employee of the Company who was not a
> selling shareholder. Following this discovery, the Audit
> Committee commenced an inquiry into the relevant facts
> and circumstances of all of the Company's prior
> acquisitions to determine if similar situations existed. The
> Audit Committee engaged legal and financial advisors to
> assist it with the inquiry and notified the Company's
> independent auditors who had not previously been aware of
> the Shareholder and Employee Payments described below.
> This inquiry resulted in the discovery that the selling
> shareholders of the Acquired Businesses:
>
> 1) Redistributed portions of their acquisition-related
> payments among themselves in amounts that were not
> consistent with their ownership percentages ("Shareholder

Payments") at the date of acquisition by Huron. Such payments were dependent, in part, on continuing employment with Huron or on the achievement of personal performance measures; or

2) Redistributed portions of their acquisition-related payments to certain Company employees ("Employee Payments") who were not selling shareholders of the Acquired Businesses. Such payments were dependent on continuing employment with Huron or on the achievement of personal performance measures.

Under generally accepted accounting principles ("GAAP"), including guidance promulgated by the U.S. Securities and Exchange Commission ("SEC"), actions of economic interest holders in a company may be imputed to the company itself. As the selling shareholders meet the criteria of economic interest holders in Huron, the Shareholder Payments and the Employee Payments are imputed to the Company even when the amounts that are reallocated do not differ significantly from ownership percentages at the date of the acquisition by Huron. As a result, both the Shareholder Payments and the Employee Payments are required to be reflected as non-cash compensation expense of the Company with a corresponding increase to additional paid-in capital. There is no tax impact to these adjustments. While the correction of these errors significantly reduced the Company's net income, earnings per share and EBITDA for each of the affected periods, it had no effect on the Company's total assets, total liabilities, total stockholders' equity, cash flows from operations, or adjusted EBITDA.

### 1) How were the acquisition-related payments originally accounted for?

The acquisition-related payments made by the Company to the selling shareholders represent purchase consideration. As such, these payments were correctly recorded as goodwill, in accordance with GAAP. Payments made upon the closing of the acquisition are recorded as goodwill on the date of closing. Earn-out payments are recorded as goodwill when the financial performance targets are met by the Acquired Businesses.

### 2) Why is a restatement required?

The Shareholder Payments and the Employee Payments are in substance a second and separate transaction from the Company's acquisition of the Acquired Businesses, which resulted in a separate non-cash accounting entry that was not recorded by the Company.

Under GAAP, the selling shareholders are economic interest holders of Huron due to their ability to earn additional consideration from Huron. As such, when the selling shareholders pay a portion of their closing proceeds or earn-outs to Huron employees who were not selling

24

shareholders or redistribute those proceeds among themselves based on employment or performance-based criteria, under GAAP, these payments are viewed as resulting from service that is assumed to have benefited the Company. Therefore, these payments are deemed to be non-cash compensation expense for the Company, and the selling shareholders are deemed to have made a capital contribution to the Company.

### 3) Why would amounts ultimately received and retained by selling shareholders (Shareholder Payments) be included?

The amount that is deemed to be non-cash compensation expense is the entire amount of the earn-out that was subject to redistribution based on their employment or performance as Huron employees. For example, if 60% of the earn-out was distributed based on ownership percentage and 40% of the earn-out was distributed by the selling shareholders based on employment or performance, then the entire 40% is deemed to be non-cash compensation expense, even if the amounts ultimately received by the selling shareholders do not differ significantly from their original ownership percentages.

### 4) Who were the certain Company employees that received the "Employee Payments"?

The Company employees who received the Employee Payments were client-serving and administrative employees of the respective acquired businesses at the date of the acquisition by Huron and similar employees hired by the respective acquired business after the date of such acquisitions. The Employee Payments were not "kickbacks" to Huron management.

### 5) Why are the required accounting entries non-cash?

The entries are non-cash because the payments were made directly by the selling shareholders from the acquisition proceeds they received from the Company. The Company did not expend additional cash with respect to the compensation charge.

44. On August 5, 2009, *The Wall Street Journal* published an article entitled

"Huron Takes Big Hit as Accounting Falls Short." The article, in relevant part, stated:

Financial downturns often expose accounting problems at companies, but scandals have been noticeably absent in the recent turmoil. Not so anymore.

Late Friday, Huron Consulting Group Inc. said it would restate the last three years of financial results, withdraw its 2009 earnings guidance and lower its outlook for 2009 revenue. The accounting snafu, which has decimated the company's shares, was all the more surprising because

Huron traces its roots to Arthur Andersen LLP, the accounting firm at the heart of the last wave of scandals. A dose of added irony is that Huron makes its money providing financial and legal consulting services, including forensic-style investigative work, and tries to help clients avoid these types of mistakes.

"One of their businesses is forensic accounting -- they're experts in this," says Sean Jackson, an analyst at Avondale Partners in Nashville, Tenn., who dropped his rating to the equivalent of "hold" from "buy." "Investors are saying, 'These guys had to know what happened with the accounting, or they should have known.'"

Investors fear the accounting issues, which will reduce net income by $57 million for the periods in question, might damage the firm's credibility. Huron's shares fell 70% on Monday, well below the price of its initial public offering in 2004. On Tuesday, Huron shares rose four cents to $13.73.

Huron, based in Chicago, was started in May 2002 by refugees from Arthur Andersen who fled the firm after it was indicted for its role in the collapse of Enron Corp. At the time, the group said that it would specialize in bankruptcy and litigation work, as well as education and health-care consulting, and that it would work with more than 70 former clients of Arthur Andersen. Arthur Andersen's guilty verdict was later overturned, but it was too late to save the firm, which was dismantled. Today, fewer than 10% of the company's employees came directly from Andersen, according to a Huron spokeswoman. Huron on Friday also announced preliminary second-quarter revenue that was shy of analyst expectations, along with the resignation of Gary Holdren, its board chairman and chief executive, along with the resignations of finance chief Gary Burge and chief accounting officer Wayne Lipski. "No severance expenses are expected to be incurred by the company as a result of these management changes," Huron's regulatory filing said.

After its founding by 25 Andersen partners and more than 200 employees, Huron grew rapidly. It soon had 600 employees and counted firms like Pfizer, International Business Machines and General Motors as clients. Growing scrutiny of accounting firms that also did consulting made Huron's consulting-only business look promising, and shares soared from below $20 five years ago to nearly $44 before the news on Friday.

That is when Huron dropped its bombshell -- one that suggests a closer alliance between consulting and accounting isn't always such a bad idea. Huron is restating financial statements to correct how it accounted for certain

acquisition-related payments to employees of four businesses that Huron purchased since 2005.

Huron said the employees shared "earn-outs," or financial rewards based on the performance of acquired units after the transaction was completed, with junior employees at the units who weren't involved in the original sale. They also distributed some of the proceeds based on performance of employees who remained at Huron, not based on the ownership interests of those employees in the businesses that were sold.

The payments were legal. The problem was how Huron accounted for these payouts. The compensation should have been booked as a noncash operating expense of the company. Huron said the payments "were not kickbacks" to Huron management, but rather went to employees of the acquired businesses.

The method the company used to book the payments served to increase its profit. The adjustments reduced the company's net income, earnings per share and other measures, though it didn't affect its cash flow, assets or liabilities.

Part of investors' concern is that they aren't entirely sure what happened at Huron. The company's executives aren't speaking with analysts, some said on Tuesday.
Employees and big producers now might bolt from Huron, Avondale Partners' Mr. Jackson says.

"It's still unclear what happened, but it's almost irrelevant at this point," says Tim McHugh, an analyst at William Blair & Co., who has the equivalent of a "hold" on the stock, down from a "buy" last week. "The company's brand has been impaired and turnover of key employees is a significant risk."

45. On or about August 11, 2009, Huron filed with the SEC a Form 8-K which stated that "the SEC is commencing an investigation with respect to the acquisition-related matters. The Company intends to cooperate with the SEC in its investigation."

46. On or about August 17, 2009, the Company filed with the SEC a Form 10-K/A, which reported restated 2006 net income of approximately \$22,859,000, or \$1.32 per diluted share; restated 2007 net income of approximately \$24,380,000, or \$1.35 per diluted share; and restated 2008 net income of \$10,081,000, or \$0.53 per diluted share.

47.     Also on or about August 17, 2009, the Company filed with the SEC a Form 10-Q/A, which reported restated first quarter 2009 net income of approximately $7,076,000, or $0.35 per diluted share.

## The Individual Defendants' Insider Selling

48.     From February 27, 2007 to March 16, 2009, defendants Holdren, Burge, Moody, Lipki, McCartney, Massaro, Lockhart and Edwards, based on their knowledge of material non-public information regarding the Company's improper accounting practices, sold approximately 248,000 shares of Huron stock not in connection with any pre-arranged 10b5-1 trading plan, garnering proceeds of nearly $15 million, as follows:

| Name | Transaction Date | Number of Shares Sold | Stock Price | Total Proceeds |
|------|------------------|-----------------------|-------------|----------------|
| Holdren | 02/27/07 | 10,000 | $63.50 | $635,000 |
| | 02/28/07 | 10,000 | $63.50 | $630,500 |
| | 03/01/07 | 10,000 | $62.79 | $627,900 |
| | 03/02/07 | 10,000 | $62.88 | $628,000 |
| | 05/09/07 | 15,000 | $65.81 | $987,150 |
| | 05/11/07 | 25,000 | $65.07 | $1,626,750 |
| | 05/14/07 | 20,000 | $65.64 | $1,312,800 |
| | 10/12/07 | 15,652 | $74.45 | $1,165,291 |
| | 02/09/08 | 2,894 | $65.43 | $189,354 |
| | 02/25/08 | 20,990 | $53.53 | $1,123,594 |
| | 03/01/08 | 4,636 | $53.06 | $245,986 |
| | 07/02/08 | 7,226 | $46.47 | $335,792 |
| | 08/08/08 | 5,000 | $59.84 | $299,200 |
| | 08/11/08 | 5,000 | $62.19 | $310,950 |
| | 08/12/08 | 10,000 | $62.21 | $622,100 |
| | 10/13/08 | 16,194 | $50.37 | $815,691 |
| | 02/09/09 | 3,030 | $48.72 | $147,621 |
| | 02/27/09 | 4,750 | $41.59 | $197,552 |
| | 03/01/09 | 11,047 | $41.27 | $455,909 |
| | **TOTAL:** | | | **$12,357,140** |
| Burge | 10/12/07 | 803 | $74.45 | $59,783 |
| | 02/09/08 | 1,087 | $65.43 | $71,122 |
| | 03/01/08 | 1,841 | $53.06 | $97,683 |
| | 07/02/08 | 2,891 | $46.47 | $134,344 |
| | 10/13/08 | 1,116 | $50.37 | $56,212 |
| | 02/09/09 | 1,463 | $48.72 | $71,277 |

| | 03/01/09 | 3,650 | $41.27 | $150,635 |
|---|---|---|---|---|
| | **TOTAL:** | | | **$641,056** |
| Moody | 02/27/07 | 6,000 | $62.13 | $372,780 |
| | 08/08/08 | 3,000 | $59.84 | $179,520 |
| | 03/16/09 | 5,000 | $40.44 | $202,200 |
| | **TOTAL:** | | | **$754,500** |
| Lipski | 03/01/08 | 405 | $53.06 | $21,489 |
| | 03/01/09 | 812 | $41.27 | $33,511 |
| | **TOTAL:** | | | **$55,000** |
| McCartney | 05/24/07 | 5,000 | $65.55 | $327,750 |
| Massaro | 02/09/08 | 1,629 | $65.43 | $106,585 |
| Lockhart | 09/03/08 | 2,500 | $64.63 | $161,575 |
| Edwards | 11/04/08 | 5,000 | $55.07 | $275,350 |
| | **TOTALS:** | **248,616** | | **$14,678,956** |

49.    The stock sales described above were not part of any normal or regular pattern or practice of such sales by defendants Holdren, Burge, Moody, Lipki, McCartney, Massaro, Lockhart and Edwards, but rather unusual in that:

          a.    These sales were not in accordance with a pre-arranged 10b5-1 trading plan, but were actually in addition to planned sales by these defendants in accordance with 10b5-1 plans;

          b.    All of these defendants' stock sales occurred soon after the Company's false and misleading financial statements were filed with the SEC, with such financial statements making no mention of the Company's improper accounting practices, described *supra.*

### The Individual Defendants' Breaches of Fiduciary Duties

50.    The Company's pervasive accounting and financial reporting problems were the direct result of the Individual Defendants' breaches of fiduciary duties. The Individual Defendants knowingly caused or allowed the Company to manipulate its financial results in an effort to inflate net income and earnings per share.

51.    From 2006 through 2009, the Company, with the knowledge, approval and/or acquiescence of the Individual Defendants, manipulated its financial results by,

29

among other things, improperly accounting for earn-out payments made in connection with four acquisitions, causing an overstatement in net income and earnings per share.

52.    In breach of their fiduciary duties, the Individual Defendants knowingly caused or allowed the Company to employ the improper accounting practices described above and failed to implement proper financial reporting and oversight procedures.

53.    In particular, the Individual Defendants failed in good faith to:

   a.    evaluate and ensure the adequacy of the Company's internal controls and accounting and financial reporting systems and practices;

   b.    evaluate and ensure the adequacy of the Company's compliance with laws and regulations relating to financial reporting; and

   c.    ensure that the financial statements were prepared in accordance with GAAP.

54.    Through their receipt of monthly and quarterly reports and attendance at Board and Audit Committee meetings, the Individual Defendants knew that Huron's accounting and financial reporting practices were improper, and its internal controls materially deficient.

55.    Indeed, the Individual Defendants deliberately maintained weak internal controls so as not to limit their ability to manipulate Huron's net income and earnings per share.

56.    The Individual Defendants' failure to ensure effective internal controls at Huron resulted in the Company materially overstating its financial results improperly booking earn-out payments.

57.    In breach of their fiduciary duty of good faith and loyalty, the Individual Defendants willfully ignored the pervasive problems with Huron's accounting and internal control practices and procedures and failed to make a good faith effort to correct

the problems or prevent their recurrence. The material non-public information discussed *supra* was well known among Huron insiders, including the Individual Defendants.

58.     As alleged herein, the Individual Defendants prepared, reviewed and/or signed the 2006 through 2009 financial statements, which were disseminated to the market and filed with the SEC. The Individual Defendants, because of their knowledge and participation in the improper accounting practices, knew that the 2006-2009 financial statements were materially false and misleading.

59.     As such, during the relevant period, the Individual Defendants knowingly caused the Company to make a series of false and misleading statements concerning the Company's financial condition, materially misrepresenting that the Company's financial condition was better than it actually was. Furthermore, the Individual Defendants made a series of false and misleading statements concerning the condition of the Company's internal controls, materially misrepresenting that the Company maintained sound internal controls and was able to regulate its business in accordance with applicable laws and regulations. As a result of these materially false and misleading statements that they knew were untrue, the Individual Defendants caused the Company's stock price to be artificially inflated.

60.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Huron has sustained damages including, but not limited to, costs and expenses incurred in connection with the Company's internal investigation and SEC investigation and costs and expenses incurred in connection with the Company's restatements of its historical financial statements.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

61.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

31

62. Plaintiff is a shareholder of Huron, was a shareholder of Huron at the time of the wrongdoing alleged, and has been a shareholder of Huron continuously since that time.

63. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

64. As a result of the facts set forth herein, Plaintiff has not made any demand on the Huron Board to institute this action against Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

65. At the time of the commencement of this action, the Board consists of six (6) directors: defendants Massaro, Ausley, Edwards, Lockhart, Moody and McCartney. Defendants Massaro and Edwards are CPAs, and therefore have specific expertise in accounting. Defendant McCartney has served as the CFO of a company and holds an MBA, and therefore has specific expertise in financial matters. Similarly, Defendant Lockhart has expertise in such matters, having served as a partner of a private equity investment firm in addition to holding an MBA.

66. The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

> a. In light of their knowledge of and participation in the Company's ongoing improper accounting practices, as alleged in detail herein, Audit Committee members McCartney, Edwards and Ausley each face a substantial likelihood of being held liable for breaching their fiduciary duties, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

> b. Massaro, Ausley, Edwards, Lockhart, Moody and McCartney knowingly approved the filing of and signed false and misleading

32

financial statements and violations of GAAP, and therefore each faces a substantial likelihood of being held liable for breaching their fiduciary duties. Accordingly, defendants Massaro, Ausley, Edwards, Lockhart, Moody and McCartney are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

c.  McCartney, Edwards and Ausley, as members of the Audit Committee during the relevant period, failed to make a good faith effort to implement appropriate monitoring, reporting or information controls to institute preventative and corrective measures. Therefore, defendants McCartney, Edwards and Ausley face a substantial likelihood of liability for breaching their fiduciary duties, as alleged herein;

d.  Defendants Moody, McCartney, Massaro, Lockhart and Edwards each face a substantial likelihood of being held liable for unjust enrichment by engaging in improper insider selling of Huron's securities as described herein. Defendants Moody, McCartney, Massaro, Lockhart and Edwards are directly interested in and face a substantial likelihood of liability for their illegal insider sales, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

e.  Defendants Massaro and Edwards are both former employees of Arthur Andersen, and both worked at Arthur Andersen over the same period of time. As a result of their longstanding personal and professional relationship, Massaro and Edwards are incapable of

disinterestedly and independently considering a demand to commence and vigorously prosecute this action against each other.

f. The Company's improper practices were not, and could not have been, the result of an exercise of good faith business judgment. On the contrary, the improper practices were the result of bad faith conduct that is not protected by the business judgment rule.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

67. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

68. As alleged in detail herein, each of the Individual Defendants had a duty to, *inter alia*, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

69. The Individual Defendants knowingly implemented and engaged in the Company's improper accounting practices, breaching their fiduciary duties.

70. Furthermore, despite their actual knowledge of the Company's improper business practices, the Individual Defendants made no effort to correct the problems or prevent their recurrence; thus, they abdicated their fiduciary duty of good faith.

71. Moreover, as directors of Huron, the Director Defendants have a fiduciary duty to the Company to implement oversight policies and systems and establish effective internal controls. However, these defendants abdicated their fiduciary duty of good faith through their sustained and systematic failure to exercise oversight.

72. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Huron has sustained damages, including, but not limited to, costs and

34

expenses incurred in connection with the Company's internal investigation and SEC investigation and costs and expenses incurred in connection with the Company's restatements of its historical financial statements.

## COUNT II

## AGAINST DEFENDANTS HOLDREN, BURGE, MOODY, LIPSKI, MCCARTNEY, MASSARO, LOCKHART AND EDWARDS FOR UNJUST ENRICHMENT

73.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

74.     Defendants Holdren, Burge, Moody, Lipski, McCartney, Massaro, Lockhart and Edwards were unjustly enriched by their receipt of proceeds from their illegal sales of Huron stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their improper conduct.

75.     To remedy their unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their improper sales of Huron stock.

WHEREFORE, Plaintiff demands judgment as follows:

> A.  Awarding the Company the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;
>
> B.  Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;
>
> C.  Ordering defendants Holdren, Burge, Moody, Lipski, McCartney, Massaro, Lockhart and Edwards to disgorge to the Company all proceeds derived from their sales of Huron stock alleged herein;

35

D.  Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accounts' and experts' fees, costs, and expenses; and

E.  Granting such other and further relief as the Court deems just and proper.

Dated: October 12, 2009

Respectfully submitted,

DAVID B. KAHN & ASSOCIATES, LTD.

/s/ Mark E. King
David B. Kahn
DKahn@kahnlawchicago.com
ARDC # 1381628
Mark E. King
MKing@kahnlawchicago.com
ARDC # 6190091
One Northfield Plaza
Suite 100
Northfield, IL 60093
Telephone: (847) 501-5083
Facsimile: (847) 501-5086

BARROWAY TOPAZ KESSLER MELTZER
&  CHECK, LLP
Eric L. Zagar
ezagar@btkmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Lawrence J. Goelz, hereby verify that I have authorized the filing of the

attached Verified Shareholder Derivative Complaint, that I have reviewed the Complaint,

and that the facts therein are true and correct to the best of my knowledge, information

and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: _10/7/09_

_Lawrence J. Goelz_
**LAWRENCE J. GOELZ**